UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEK NGOUN,<br><br>               Petitioner,<br><br>vs.<br><br>JOHN MARSHALL, Warden,[1/]<br><br>               Respondent. | No. 1:03-cv-05367-JKS (HC)<br><br>MEMORANDUM DECISION |

      Petitioner Chek Ngoun has filed a petition for habeas corpus under 28 U.S.C. § 2254. Petitioner is currently serving a term of 29 years and four months to life in the California Men's Colony, San Luis Obispo, California.

STATE COURT PROCEEDINGS

      Petitioner was charged by information filed in Stanislaus County Superior Court with premeditated first degree murder (count I, a violation of CAL. PEN. CODE § 187), four counts of assault with a firearm, (counts II, III, IV and V, a violation of CAL. PEN. CODE § 245(a)(2)), possession of a firearm by a felon (count VI, a violation of CAL. PEN. CODE § 12021(a)(1)) and participating in a criminal street gang (count VII, a violation of CAL PEN. CODE §186.22(a)). As to counts I through V and VII, the information alleged that Petitioner had personally used a firearm within the meaning of CAL. PEN. CODE § 12022.5 and that as to counts I through VI, that appellant had committed the offense for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of CAL PEN. CODE § 186.22(b)(l). Finally, as to counts II and III, the information alleged that appellant had inflicted great bodily injury within the meaning of CAL. PEN. CODE § 12022.7.

---

      [1/] John Marshall, Warden, California Men's Colony, San Luis Obispo, California, substituted for Derral G. Adams. FED. R. CIV. P. 25(c).

On count I, the jury found appellant guilty of second degree murder. It also found appellant guilty on counts IV, V, VI and VII and not guilty of counts II and III. The jury found true the personal firearm use allegation of counts I, IV, V and VII and the criminal street gang allegations of counts I, IV, V and VI. Petitioner was sentenced to a total term in state prison of 29 years, four months to life as follows: 15 years to life, plus the upper term of 10 years for the firearm use enhancement and the midterm of two years for the street gang enhancement on count I; one year (one third the middle term), plus one year and four months (one third the middle term) for the personal use enhancement on count IV. On count V, the court imposed a term of three years plus four years for the firearm use enhancement, to be served concurrent with the term imposed on count I. The court imposed, but stayed pursuant to CAL. PEN. CODE § 654, the upper term of three years for both counts VI and VII, plus 10 years for the firearm enhancement on count VII and two years for the street gang enhancements on counts IV, V and VI.

Petitioner timely appealed his conviction to the California Court of Appeal, which affirmed his conviction is a partially published opinion, *People v. Ngoun*, 105 Cal.Rptr.2d 837 (2001). Petitioner sought review in the California Supreme Court, which summarily denied review without opinion on July 25, 2001. Petitioner did not file a petition for *certiorari* with the U.S. Supreme Court and his conviction became final 90 days later, October 23, 2001. *See Wixom v Washington*, 264 F.3d 894, 897 (9th Cir.2001). On November 15, 2001, Petitioner filed a petition for a writ of habeas corpus in the California Superior Court, Stanislaus County, which was summarily denied December 12, 2001, on the basis that the issues raised were, or could have been, raised on the direct appeal citing *In re Terry* (1971) 4 Cal.3d 911, 927. Petitioner filed a second petition for a writ of habeas corpus in the Stanislaus Superior Court on January 17, 2002, which was denied on January 18, 2002, as being essentially a duplicate of the petition denied on December 12, 2001, and for the same reasons. On February 21, 2002, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeals, Fifth Appellate District, which petition was summarily denied without opinion on February 28, 2002. On April 5, 2002, Petitioner re-filed his petition for a writ of habeas corpus with the Fifth Appellate District, which was summarily denied without opinion on April 25, 2002. On June 13, 2002, Petitioner filed a petition with the California Supreme Court, which summarily denied his petition without opinion on September 18, 2002. On November 14, 2002,

Petitioner timely filed his petition for relief under 28 U.S.C. § 2254 in this Court, on March 23, 2003, filed an amended petition,[2/] and, by leave of court, a second amended petition on December 22, 2003.

## FACTS [3/]

On the evening of August 17, 1996, [Petitioner], Eng Leukhamphan, Rottanak Kong and Virasack Pholsina decided to attend a birthday party at the Grange Hall in Modesto. Before going to the hall, they stopped at [Petitioner's] house, where [Petitioner] retrieved two guns, a .22 caliber and a .38 caliber revolver, "in case something happened." [Petitioner] gave the .38 to Kong and kept the .22 himself. All four individuals were members of the Modesto Hit Squad (MHS), a subset of the Crips, a criminal street gang.[2]

---

[2]     All four claimed at trial they were not members of the gang on the night of the party. However, each testified that the other three were.

---

Members of several other gangs were present at the party, including members of the Oak Street Posse (OSP), a gang which operates near MHS territory. MHS and OSP were at one time close associates. However, a rift between the gangs occurred after both were involved in the shooting of a police officer and various members testified against one another. [Petitioner] had testified against George Johnson who was a MHS member but had close ties with OSP. As a result, there was bad blood between [Petitioner] and OSP member Troy Lee Stine. Stine was at he party that night and he and [Petitioner], and other members of OSP, exchanged "mean mugs" or were "mad dogging" each other, terms which in gang parlance mean exchanging aggravated looks of disrespect. Such facial confrontations between rival gang members generally require an aggressive response. [Petitioner] told Kong to "watch his back" because OSP was going to get him.

At some point in the evening, a fight broke out in the hall. Apparently none of the four friends were involved in the fighting. The disc jockey at the party told the group to take the fight outside. At that point, [Petitioner] and his friends left the hall and walked towards the parking lot. A crowd of party-goers emerged from the hall and the fighting continued. Numerous shots were fired from several different guns. After hearing the first shots, [Petitioner] pulled out his gun and fired all nine shots in the direction of the crowd, moving from left to right and right to left. Kong fired the .38 into the air. When [Petitioner] realized that Kong was firing into the air, he

---

[2/] See the Order Vacating October 9, 2003, Findings and Recommendation entered on November 3, 2003, at Docket No. 16 for history of the filings in this Court.

[3/] Taken from the written decision of the California Court of Appeal on the direct appeal. The Court has substituted "Petitioner" for "Appellant."

grabbed the gun and angrily yelled what "the fuck you doing." He then fired the .38 into the crowd twice more.

Kenneth Martinez and his brother Kevin Frankie Martinez were also at the party that night. They left the hall when the fight began. Once outside, Kenneth Martinez became engaged in the fight. After throwing several punches, he heard gun shots coming from several different guns. He was hit in the right hip but survived. His brother Kevin was not as lucky. A bullet pierced his heart and he fell to the ground. When people started shouting that Kevin had been hit, Kenneth, Stine, Damien Hall (a known OSP member), and Joseph Perez put Kevin in a truck and drove him to a hospital. Kevin was dead on arrival. Perez had been hit in the arm. At trial, neither Kenneth Martinez or Perez could identify a shooter, although Stanislaus County Deputy Sheriff Ridenour testified Perez stated when interviewed that he saw an Asian male firing a weapon.

After the shooting, [Petitioner], Kong, Leukhamphan, and Pholsina drove away together. [Petitioner] told Kong to dump the bullet casings out the window, which Kong did, and told all three to keep their mouths shut.

On September 9, 1996, [Petitioner] used the same .22 caliber firearm to commit three attempted murders at a house on Longfellow Drive in Modesto. [Petitioner], Leukhamphan and others were attending a party on Longfellow. After [Petitioner] stepped outside to relieve himself, he thought the three men standing across the street in their front yard had yelled at him. One of the men was wearing a red sweat shirt. [Petitioner] angrily confronted the men, yelling "'MHS'" and "'Crip Cuz.'" A fight ensued. Later [Petitioner] had Leukhamphan take him to retrieve the .22 caliber revolver and the two returned to Longfellow. [Petitioner] exited the vehicle and walked towards the victims, shooting. All three men were hit, although none died from their wounds.

Police recovered a .38 caliber revolver from [Petitioner's] brother, but were unable to locate the .22 caliber weapon. Ballistics expert Sara Yoshida compared the .22 caliber bullets taken from the victim (bullet number one) and two found at the scene on Longfellow Drive (numbers three and four).[3] The bullets she received were damaged, and a good assessment was difficult. She was unable to do any comparison of bullets one and three. As to bullets three and four, she noticed a difference which tended to lead her to the conclusion they were not fired from the same weapon. However, the damage to the bullets was such that she could not eliminate the possibility that they could have been fired from the same weapon. She testified she would not consider eyewitness testimony that the bullets came from the same gun inconsistent with what she saw. Although Yosida had similar problems comparing bullets one and four, she did conclude that these two "more likely than not" were fired from the same firearm.

---

[3] Yoshida also compared a slug taken from another victim Manuel Niave, who was shot in the leg at the Grange Hall (bullet number two). However, this bullet was "probably"

from a .25 automatic firearm and thus definitely not from either of the two guns in [Petitioner's] possession that evening.

Modesto Police Detective Brocchini testified as an expert witness on gang behavior. He stated that gangs derive their power and authority from fear, which they equate with respect. When a gang member or the gang is "disrespected" in some way, a violent response is necessary in order to preserve respect. He also stated that gang members lose their respect or status in the gang when they cooperate with police, and therefore, most are reluctant to do so. He said that MHS is a very active criminal street gang, and its members engage in a variety of criminal acts including selling illegal drugs, murders, robbery, car theft, burglary, assaults, and drive by shootings. Brocchini testified that, in 1991 and in 1992, [Petitioner] was arrested for selling cocaine and that several other gang members were with him, and, in 1995, [Petitioner] was arrested with several other MHS members for possession of illegal firearms. In Detective Brocchini's opinion, both the Grange Hall incident and the Longfellow shootings were gang-related acts done for the benefit of the gang and to improve [Petitioner's] status in the gang. Gang graffiti was painted on the walls of Grange Hall the evening of the party.

Both Kong and Leukhamphan testified that, prior to 1992, [Petitioner] had been a gang leader, a "shot caller" who was respected and looked up to by other members. However, [Petitioner] lost that status when he testified against George Johnson. As a "snitch[]," he was thereafter not respected or trusted.

*Defense*

Although he admitted being at the party, [Petitioner] denied being the shooter. He claimed Kong had his .38 and that the .22 belonged to Leukhamphan, who carried it that evening. According to [Petitioner], he was no longer an active member of MHS, but the other three were. He also claimed he and Stine had no current problems, although he admitted a conflict from their childhood. He denied any confrontation at the party, and denied any "mean mugs" were exchanged. After the fight broke out, [Petitioner] said he and Kong left through a window and he saw Kong fire the .38 into the crowd once. He did not see Leukhamphan fire a gun because the four were not together when the shooting occurred. They met at the car.

After initially denying any involvement in the Longfellow shooting, [Petitioner] later admitted the same gun was used both times. However, he testified that, although he shot the victims on Longfellow Drive, Leukhamphan had the gun at the Grange Hall party. Stine testified he had no fights or arguments with [Petitioner] and he did not see [Petitioner] at the party. He testified no one in their group had problems with Asian males that night. Kenneth Martinez also testified he saw no problems with Asian males that evening and did not remember [Petitioner] saying he would kill him.

Jerry Simpson testified he was at the party and saw a white male matching the description of an individual later identified as Joseph Pekar shoot at a Mexican male who then fell to the ground. Simpson stated he did not know the name of this shooter, and if he did he would not reveal it, but it was definitely not [Petitioner]. He also stated he did not remember seeing any Asians at the party and could not identify the man who was shot.

Numerous other witnesses who were at the party that evening testified to seeing shooters at various locations outside the Hall, and to hearing gun shots from different guns. None of the witnesses other then Simpson, Kong, Pholsina and Leukhamphan could or would identify a shooter.

*Rebuttal*

Stanislaus Sheriff Deputy Alvarez testified he interviewed Kenneth Martinez about the incident. According to Alvarez, Martinez said he had been in a fight that night with an Asian male who threatened to kill him. Deputy Ridenour testified he interviewed Perez, who told him that OSP members and some Asians were "chest bumping" at the party and that he saw an Asian male firing a weapon. Alvarez also testified he had interviewed Simpson the night of the party. Although Simpson appeared cooperative, he did not identify the shooter. He also told Alvarez there had been a fight involving some Black males. He told Alvarez he heard four to five gunshots, from two different guns, and then left the party.

Deputy Sheriff Heyne testified he interviewed Simpson on August 21, 1996. Simpson was reluctant to talk. He said he saw two shooters, an Asian male who shot into the air and a second shooter. He described the second shooter as white, 5'11", 220 pounds, with a blond crew cut.[4] Simpson said he would refuse to cooperate and did not want to be a witness in this case. Still later, Simpson was interviewed by the district attorney's investigator and the defense investigator. Simpson told the defense investigator he knew the shooter from the past. Simpson told the district attorney's investigator he had known the shooter since high school and gave a different description of the perpetrator  6 feet tall, 230-260 pounds and light brown hair.

---

[4]     This matches Pekar's description.

GROUNDS RAISED/STANDARD OF REVIEW

In his second amended petition Petitioner raises four grounds.  Ground 1: Ineffective assistance of trial counsel (failure to impeach prosecution witnesses and allowing introduction of inadmissible evidence).  Ground 2: Admission of false testimony violated his rights to due process. Ground 3: Miscarriage of justice in that the allegations at trial were unfounded under the facts of the

case. Ground 4: Ineffective assistance of appellate counsel (failure to raise issues of insufficiency of the evidence and perjured testimony by witnesses).

Petitioner presented his first three grounds to the Stanislaus Superior Court, California Court of Appeal, and California Supreme Court in his petitions for a writ of habeas corpus presented to those courts, and his fourth ground only in the petition for writ of habeas corpus in the California Supreme Court. The California Court of Appeals and Supreme Court summarily denied the petitions submitted to those courts without opinion or citation. The Stanislaus Superior Court, in denying the petition filed in that court, held:

> Contentions raise and rejected on appeal, or which could have been raised by a timely appeal but were not, usually cannot be renewed in a petition for habeas corpus because habeas corpus ordinarily cannot serve as a second appeal or a substitute appeal.
>
> In re Terry, (1971) 4 Cal. 3d 911, 927. Defendant's petition raises issues which either were or could have been raised in his appeal filed with the Fifth District Court of Appeals.

Respondent concedes that Petitioner has exhausted his state court remedies.

Because Petitioner filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). Consequently, this Court cannot grant relief unless the decision of the California court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73 (2003) (explaining this standard). In applying this standard, this Court reviews the last reasoned decision by the state court, *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir.2004), which in this case was that of the California Superior Court, Stanislaus County, on the state petition for habeas corpus. In addition, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must assume that the state court decided all the issues presented to it and perform an independent review

of the record to ascertain whether the state court decision was objectively unreasonable. *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir.2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir.2005) (per curiam).

To the extent that Petitioner alleges errors of state law, they are beyond the purview of this Court in deciding a petition for federal habeas corpus relief. This Court may only address violations of federal law. 28 U.S.C. § 2254(d); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (Citations and internal quotation marks omitted)).

## DISCUSSION

Respondent argues that Petitioner is procedurally defaulted on his first three grounds. Under California law, contentions that could have been raised during direct appeal, but were not, generally cannot be renewed in a petition for habeas corpus. *In re Terry,* 484 P.2d 1375, 1387 (Cal.1971). It has long been the law in California that sufficiency of the evidence to warrant conviction is not a proper issue for consideration in a habeas corpus proceeding. *Ex parte Lindley*, 177 P.2d 918, 926–27 (Cal.1947). Although they are couched in terms of constitutional violations, the second and third grounds are, in reality, attacks on the sufficiency of the evidence. Petitioner points to the inconsistencies in and between the testimony of various witnesses, the fact that principal witnesses were granted favorable treatment, including immunity, and asserts a conclusory allegation that the prosecution witnesses committed perjury. The Court agrees with Respondent that, because Petitioner's claims were defaulted in state court on an adequate and independent state ground, they will not be considered in federal habeas proceedings unless Petitioner can demonstrate cause for the default and actual prejudice. *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991). Petitioner has made no such showing in the petition before this Court.

Moreover, even if the Court were to address the second and third grounds on the merits, it could not find in favor of the Petitioner. The constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). This Court must,

therefore, determine whether the assumed decisions by the California courts on the merits unreasonably applied *Jackson*. Numerous arguments made by Petitioner concerning the evidence in his petition before this Court were also made to the California Court of Appeal on direct appeal.[4/] In rejecting Petitioner's arguments, the Court of Appeal, found, *inter alia*:

> We therefore disagree with appellant that the jury was never "made aware it should consider these matters in assessing the credibility of the prosecutor's eyewitnesses." The subject was the focal point of considerable testimony and argument, and there was no indication to the jury, by the lawyers or the court, that the benefits received from the prosecution by Leukhamphan or Kong could not be assessed in deciding whether their testimony was credible.[9]

---

[9] Even after a reading of the cold record, it is obvious to us that most of the witnesses testifying about the events at Grange Hall on August 17 withheld information, minimized their own involvement and culpability, and distorted the truth of their observations. Many of the witnesses were in custody on other offenses, many were gang members with criminal records. The jury, of necessity, was required to sort through the evidence presented for the few kernels of truth they decided were to be found there.

---

\* \* \* \*

> There certainly was a reasonable basis for the jury's decision to reject Simpson's testimony. Simpson had spoken to police at the hospital, and never mentioned he had seen the shooter. Four days later he told Detective Heyne he had seen two shooters, one an Asian male who fired into the air, and the other the White male resembling Pekar. Two days later he viewed a photographic lineup which included a photograph of Pekar, and refused to or was unable to identify the shooter. Later, he told the district attorney's investigator he did not see anyone actually shoot a gun or anyone being shot, but that he saw a White male, 6 feet tall, weighing 230 to 260 pounds with light brown hair, standing near the crowd holding a gun. He told the investigator he knew this individual from school. He also told the defense investigator he knew the shooter from the past, but then denied this at trial. Only at trial did he say he saw a victim fall after being shot in the back.[16] Simpson's fluid, ever-changing stories certainly did not promote his credibility.
>
> Against this watery evidence was (1) the testimony of Leukhamphan, Kong and Pholsina that appellant shot into the crowd, which the jury necessarily believed despite the obvious grounds for opposite conclusions;[17] (2) the expert's conclusion that the same gun was used to fire the bullet found in the victim and the bullet found at the scene on Longfellow Drive, and (3) the highly incriminating testimony from

---

[4/] The Court of Appeal review of the sufficiency of the evidence was in the context of Petitioner's challenges to several jury instructions.

appellant's own mouth that the same gun was used in both shootings and that he was the shooter at Longfellow Drive.

---

[16] The defense investigator testified at trial he believed Simpson had told him that he saw a Mexican fall to the ground after being shot in the back. However, this information, albeit significant, was not included in the investigator's written report.

[17] Had the jury found Leukhamphan, Kong and Pholsina unworthy of belief, appellant would not have been convicted under counts IV and V as well as count I.

---

\* \* \* \*

There were several rival gangs represented at the Grange Hall party and the fight which broke out was general in nature, not isolated between Kenneth Martinez and appellant. Others were fighting; others were shooting weapons. Appellant's primary dispute was with Troy Lee Stine, not Kenneth Martinez. Stine and other OSP members, including Damien Hall, were in the crowd outside the hall. Moreover, [Petitioner] was a long time gang member who had been "mean mugged" by OSP members earlier in the evening. Brocchini testified that acts of violence are one of a gang's means by which to gain respect and generate fear. [Petitioner] shot the .22 caliber weapon into the crowd, moving from right to left. He then shot the .38 into the crowd at least twice. The jury could have reasonably inferred from this evidence that [Petitioner's] aggressive actions were not aimed at any particular person but at OSP members generally.[18] [Petitioner's] claim the evidence proves he intended only to shoot the three known victims is based upon an impermissibly selective view of the record.

---

[18] It is not difficult to understand why the jury acquitted on counts II and III. Undoubtedly an assault was committed as to both Kenneth Martinez and Perez -- they were hit, the battery was completed. However, there was no proof that the bullet which was the mechanism of the assault came from [Petitioner's] gun. This created a reasonable doubt as to whether [Petitioner] had assaulted these two identifiable victims, especially since there was ample evidence appellant was not the only one shooting into the crowd.

---

This Court must be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 406 F.3d 1262, 1275 (9th Cir.2005). Where, as in this case, the question is one of credibility, the finding of the jury carries the day. *See Schup v. Delo*, 513 U.S. 298, 330 (1995); *Bruce v Terhune*, 376 F.3d 950, 957 (9th Cir.2004). Petitioner misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. Under *Jackson*, the role of this Court is to simply determine whether

there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction. That such evidence exists is clearly established by the record in this case. Petitioner bears the burden of establishing by clear and convincing evidence that the factual findings of the jury were erroneous; a burden Petitioner has failed to carry. Petitioner is not entitled to relief on his second and third grounds.

The first ground, ineffective assistance of counsel, stands on a substantially different footing. Normally, under California law, an ineffective assistance of counsel claim is more appropriately brought on habeas corpus than on direct appeal. *People v. Snow*, 65 P.3d 749, 789 (Cal.2003); *People v. Lucero*, 3 P.3d 248, 269 (Cal.2000). However, if the record on appeal affirmatively discloses the basis for an ineffective assistance of counsel claim, it may be addressed on direct appeal. *See People v. Fosselman*, 659 P.2d 1144, 1149 (Cal.1983). Respondent has cited no decision of the California Supreme Court that the fact a habeas petitioner might also have been able to raise the issue of ineffective counsel on appeal necessarily precludes habeas relief, and independent research by the Court has not revealed any such decision. Consequently, this Court cannot find that the denial of the petition for habeas relief in the state courts was based upon an adequate independent state ground consistently applied.[5/]

To demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

In his first ground Petitioner complains that (a) defense counsel failed to impeach the main prosecution witnesses and bring to the court's attention perjured testimony, and (b) allowed the court to use the evidence from the Longfellow case. Neither claim is supported by the record. First,

---

[5/] The Court notes that Petitioner did, in fact, raise a different ineffective assistance of counsel claim than that presented to this Court on his direct appeal, which was addressed by the California Court of Appeal.

Petitioner has not identified by name which witnesses, other than Eng Leukhamphan, were not properly impeached.  As respondent points out, defense counsel inquired into Leukhamphan's agreement to testify against Petitioner in exchange for a reduced sentence on a robbery charge, elicited admissions he suffered prior felony convictions for selling drugs, and had testified as a prosecution witness in approximately five other cases after receiving immunity.  The record also discloses that trial counsel forcefully argued to the jury the "benefits" Leukhamphan had received in exchange for his testimony to attack his credibility.  Petitioner's conclusory characterization of Leukhamphan's testimony as perjured simply does not prevail.

Petitioner's allegation that trial counsel "allowed the trial court to use evidence from the Longfellow case" is utterly without merit.  The record clearly shows that trial counsel vigorously opposed the introduction of that evidence and was overruled by the trial judge, which ruling was upheld by the California Court of Appeal on direct appeal.  This hardly constitutes "allowing" evidence to be introduced.  Petitioner is not entitled to relief on his first ground.

In his fourth ground Petitioner asserts ineffective assistance of appellate counsel for failure to raise issues of (1) insufficiency of the evidence and (2) that the witnesses committed perjury.  As noted above in the discussion of Petitioner's second and third grounds, the California Court of Appeal found sufficient evidence to convict Petitioner of every count to which a guilty verdict was returned.  Notably absent from the petition is how, or to what extent, appellate counsel should have raised insufficiency of the evidence on the trial record in this case.  The thrust of Petitioner's arguments on this, as well as the second and third grounds, is basically that the prosecution witnesses lied and, to the extent that their testimony tended to incriminate him, it should have been disregarded.  Inasmuch this Court, as did the California Court of Appeal, has determined that there was sufficient evidence, if accepted as credible by the jury, to sustain Petitioner's conviction, those issues are without merit and the failure of appellate counsel to raise them did not constitute ineffective assistance of counsel.  *See Jones v. Barnes*, 463 U.S. 745, 751–52 (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1428 (9th Cir.1989) (holding that appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).  Petitioner is not entitled to relief on his fourth ground.

Accordingly, because Petitioner is not entitled to relief under any ground asserted,

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT** the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks and citations omitted)); *Hoffman v. Arave*, 455 F.3d 926, 943 (9th Cir.2006) (same).  All federal constitutional issues properly raised in the petition were deemed addressed by the Stanislaus County Superior Court on Petitioner's state habeas petition to the extent they were not procedurally defaulted, or deemed addressed by the California Supreme Court in denying Petitioner's petition for habeas relief before that court, and no reasonable jurist could find that those decisions were "objectively unreasonable."

The Clerk of the Court shall enter final judgment accordingly.

Dated:  June 7, 2007.

                                                  s/ James K. Singleton, Jr.
                                                  JAMES K. SINGLETON, JR.
                                                  United States District Judge